Good morning, Your Honors. May it please the Court, Hillary Hahn appearing on behalf of the petitioner. And if I may, I'd like to reserve two minutes for rebuttal. Very well. Thank you. The BIA here relied on three alleged inconsistencies to find that Ms. Barraza was not credible. We don't believe that any of these three inconsistencies provide substantial evidence for an adverse credibility determination, and I think that's particularly true when considered in the totality of the circumstances. I'm just going to briefly go through each of those alleged inconsistencies. First, the Board relied on an alleged inconsistency about how Ms. Barraza knew that the people who shot at her house were gang members. According to the Board, she testified inconsistently at her reasonable fear interview and at an immigration court hearing. But the problem with the Board's reasoning is that she was asked different questions at the reasonable fear interview and at the immigration court hearing. At the reasonable fear interview, she was asked how she knew that the people were gang members, and she testified that the next day she spoke to some security guards who had witnessed the incident and they told her that the people were gang members. At her immigration court hearing, though, she was never asked how she knew the people were gang members. She did testify that she looked out the window and saw the people who were shooting, but she never testified that that was how she knew that the people were gang members. Didn't she go on to say, and I saw it by light? She did, but she didn't testify that that was how she knew they were gang members. She said that she saw people, but she didn't say that that was the way that she found out that they were gang members. And then there's also, you know, the board also kind of pointed out that at the reasonable fear interview, she never said that she peeked out the window, but that's because she was never asked whether she looked out the window. Her testimony at the reasonable fear interview is that she heard the shots, she threw her son onto the floor, and then the next thing she says is that the next day she spoke to people who told her who shot at the house. So there was really no detail about kind of the interim period there, and she was never asked. So there was really no inconsistency. She just added more detail that she hadn't added at the reasonable fear interview. And beyond that, the immigration judge's attempt to have her explain this alleged inconsistency, not only was it entirely convoluted, and we laid out the exact question that he asked in the reply brief, but it also assumed something that wasn't true. It assumed that she had answered those two questions inconsistently at the reasonable fear interview in the immigration court hearing, and she hadn't done that. So that just added to the confusion. And so in our view, that's neither an inconsistency nor was she given a proper opportunity to explain what the immigration judge perceived to be an inconsistency. The second... the second ground that the board relied on was Ms. Barras' inconsistency about the order of two different events, the shooting at her house and the threatening visit from a gang member. That was... she was inconsistent. She switched the order of the two events. In Kumar, this court said that the board should not rely heavily on inconsistencies that are attributable to simple human error. That's all this is. She switched the order of two events that happened very close in time. By correcting at her hearing the proper order of the events, there was no attempt to enhance her asylum claim. Whether one happened before the other or vice versa, the takeaway is really just the same. She was threatened by gang members who shot at her, and then somebody came and told her why they'd shot at her and who had done it. Well, there's a little more to it. In her testimony, she's entirely consistent. What's inconsistent is the written statement prepared by somebody else for her. I'm speculating, but it kind of smells to me that if she's telling the truth, what happened is that she had someone who was writing hastily and not recording properly. But when she herself is talking in her own voice, she's entirely consistent. Right, and I think, you know, she said that, you know, she said at the hearing in response that it was a mistake in her declaration, and I mean, I think that that's consistent with what you're saying. I mean, there was either a mistake with, you know, communicating at that particular point in time or her own kind of review of the declaration maybe wasn't thorough. As you read that written statement, it's very clearly it's not written in her own voice. That's written by somebody who's quite fluent in English, who's kind of... Right, and we'll take responsibility. I mean, we prepared the case, we interviewed her, we wrote the declaration, we read it back to her in Spanish, you know, that there was a mistake. And again, I think this is really just nothing more than a mistake. And her response to the questions about it, she was asked three different times on cross-examination, twice by the trial attorney and once by the immigration judge, why she made this mistake or why there was this difference. And she just said very plainly, you know, it was a mistake and I'm sure that it happened. She was honest about it. She didn't try to, you know, make, you know, to try and walk back, take back her testimony or walk it back. This is outside the record. Have you talked to the person who prepared the statement for her? Our office did. I know that. I'm asking, have you talked to the person within your office? But that's not in the record and not before us. It's not in the record, I understand. We can't consider that. That may be privileged information that you might want to think about. Don't even answer the question. I realize it's not in the record. Then I'll take that to you and not answer the question. The third alleged inconsistency that the board relied on was again something that in our view isn't an inconsistency at all. This is about whether Ms. Barras' husband was present at the soccer field at the time that the armed men chased her. And Ms. Barras had testified that her husband was there at the soccer field. Her cousin, he didn't testify that the husband wasn't there, but when he was asked about who was there, he never said that the husband was there. At the end of the day, really, there's no inconsistency. This is just, you know, the fact that the cousin didn't mention that the husband was there doesn't mean he wasn't there. And under the circumstances, the factual circumstances that the cousin described, it was particularly incumbent upon the immigration judge if he thought that there was an inconsistency to ask about it. The cousin was 13 years old at the time. He testified that there were two different soccer games going on and people playing in those games. He said that there were other people who were waiting to play soccer and then there were other people presumably watching the soccer match and then there were probably some other people kind of in the vicinity. So there's a very good reason to think that he just simply didn't see Ms. Barras' husband there. But if the immigration judge thought that there was an inconsistency, it was not at all clear from the record that there was. The immigration judge should have asked for an explanation and that's why this court has generally held that asylum applicants need to be given an opportunity to explain any alleged inconsistencies. Even if the court finds that there is some validity to one or maybe even two of these grounds, under Kumar, we still believe that the agency's decision should be reversed and that's just because if you take away one or two of these grounds, ultimately the agency's initial credibility determination has really no legs left to stand on when you consider it in the totality of the circumstances. And I'd like to make one other quick point with regard to the credibility claim. Ms. Barras' withholding claim was based on really two discrete grounds. Fear of the gangs and fear of her husband who subjected her to domestic violence both in the United States and in El Salvador. All of the board's stated reasons to find her not credible related to the gang-based claim. And this is significant because the immigration judge did find her not credible specifically as to the domestic violence claim. The board decided not to adopt that reasoning. And so even if the court were to find that the adverse credibility determination has validity or it should be upheld, we believe that that's true only as to the gang-based claim because these are entirely discrete claims based on separate sets of facts and the agency hasn't provided any basis whatsoever to question that she was a victim of domestic violence and that her husband still would seek to harm her. Or I should say ex-husband. Turning quickly to the unable or unwilling issue, the board also found that Ms. Barras had not established that the government in El Salvador was unable or unwilling to protect her from either gang violence or from domestic violence. We don't believe this conclusion is supported either by the facts of the case or by the country condition's evidence of record. You know, I think the one significant fact in this case is that Ms. Barras was taken by the police, provided information about the whereabouts of the gang member, and then almost immediately afterwards the gang had become aware of the fact that she had done that. So understandably, Ms. Barras had no faith that the police were going to be able to protect her if they were seemingly in cahoots with the gangs. Well, and she testifies that she doesn't want to go to the police because they're linked to the gangs. Right, but that's testimony we hear in almost every case out of this country. So the question I have is that, you know, the fact that the police don't do anything, of course we do have the warrant and conviction of Mr. Abarca here, so it's not that nothing is happening. The question is whether... You can't say, you know, would it have been futile? And that's where I'm having some difficulty. Maybe you can fill in here, because it's not clear to me, given the totality of the circumstances, that it would have been futile. But we always hear the same testimony as, well, they can't do it, and it would always be futile. And that seems to me to be generalizations that wouldn't support a petitioner's petition versus the findings of the BIA. Right. I think you have to look at the record of this particular case to make that determination. And, you know, the fact that the gangs became aware immediately that she had done this, I mean, suggests very strongly that there was this link between the police and the gangs. The police, when they took her to identify this gang member, threatened that they would take away her son if she didn't help them, which didn't exactly inspire her confidence in the police being willing to protect her. And then even later, after she came to the United States, you know, William, the gang member, called her from prison in El Salvador to threaten her. So the government wasn't really providing any kind of protection to her. I mean, this is the same as in the J.R. case, right? There was a prosecution. The police did take some action to punish gang violence, but they weren't ultimately able to protect the actual asylum applicant in that case. And I guess the other point, just with regard to general country conditions, we believe that those do show that it would have been futile and dangerous for her to report to the police. The board cited, I think, two different passages from the administrative record in support of, you know, their determination that the Salvadoran government could protect her. One of them is at page 360 of the administrative record. It's a discussion about the fact that the Salvadoran laws prohibit domestic violence, and the prosecutors are required to prosecute rape cases even if the rape victim doesn't want to go forward with the charges. I mean, going back to the J.R. case, that seems to be quite a bit different because there I thought the government authorities actually knew of these escalating threats against the petitioner, and here we don't have that, do we? How do the police know that there's an issue? We don't have that. That's kind of a yes or no. Yeah, we don't have that here. But the escalating threats do show that the government's unable to protect her from them happening, right? I mean, they're aware that she's... That's a different, you know, it's a question... The government can't necessarily intervene in terms of escalating threats. It can come in and remedy, but if the government isn't aware of those threats, then you just have a different situation than J.R., it seems to me. She didn't go to the police, right? She didn't go to the police. And I understand we have cases that say, you know, you don't have to go to the police. Right. It just concerns me that you're in this vacuum of evidence in terms of how they can't protect her but they don't know about it. It's like an internal contradiction. Right. I mean, I think it just kind of goes back... In terms of why she didn't report, I mean, I think it just goes back to her own interactions on that day with the police and kind of what happened subsequently. I'll give you some more time in rebuttal. I did have two more questions for you real quick. First, I think there was a mention in the record of her son. Is the son still a minor or is the son an adult now, if you know? He is still a minor. Still a minor. And I'm just curious, during all the years that she's been in the United States, did she have any criminal convictions of any kind? No. Okay. Thank you. So we'll give you three minutes for rebuttal. Great. Thank you. Good morning. Erin Nelson for the Attorney General. Your Honors, as we argue in our brief, the petition for review can and should be denied based on one of the two bases that the agency found. And it won't surprise you that we believe that there are indeed several inconsistencies that can support that and that they're not trivial, as Mr. Hahn proclaimed. And I would like to start with the fact of the shooting. The fact of the shooting, in the asylum interview context, the petitioner said that she heard shots and she threw herself on the floor. And when asked how she knew who did the shooting, she said, well, the next day or two days after, the guards for the ranch, the adjacent ranch, told her that they had seen some ne'er-do-wells coming down the street and then thereafter they heard shots. So if we take that, that's basically a hearsay. Well, they said that they saw, they didn't see them shoot, they saw these guys going down the street and then there was a shooting and so we can assume. And they said they were gang members. And they said they were gang members and evidently, you know, they knew that they were gang members by how they dressed or tattoos or something else. In her testimony, she says that she saw the shooters through the window and she knew that they were, she again threw herself down on the ground with her child, but while she's being shot at, she also looks through the window and she saw that they were gang members. Now... Now, did she say, and I knew because I saw them that that's how I knew they were gang members? I mean, I'd have to go to the specific line, but she... No, no, well, maybe you should because that's my question because I don't think she did say that. Well, in her declaration, she said, in her declaration at 277, she said that she looked out and she saw the shooting and she said that her house was shot at, whereas in her testimony at 192 on cross-examination, she was asked about the shooting and she said they shot in the air, whereas in her... That's not the inconsistency that's been identified. I mean, if she saw these people, that's one thing, and then the people... Neighbors from the neighboring ranches later say, and they were gang members. Aren't those two separate things? I think that they're... That's the crux of the inconsistency about who did the shooting because before the asylum officer, she says that she dropped to the ground. There was a shooting. This is a case where as we get further away from the events that form the crux of her protection claim, she gets more detailed and there become more facts. And I can understand that Mr. Hahn maybe would like not to have to rely on the seven-page, single-spaced declaration that Your Honor says was not in her voice, but it is their case-in-chief and it was presented as part of their evidence. And so, you know, the difference here, even if we don't look at the declaration, the difference between hearing the day after that there were gang members who came down the street and then we heard shooting and that must have been who shot your house and having seen the shooting and surmised that they were gang members by how they looked is, again, a difference of hearsay versus first-person witness account of somebody shooting either at her house, near her house, in the air, by her house. And the reason that that matters is if you look at her declaration, if you look at her declaration, she said that her home and adjoining restaurant was located at the crossroads of two competing gangs and that there was gunfire all the time. So if we take that as, if we take her at her word, there was gunfire all the time and there was a shooting based on her asylum interview. There was a shooting. We don't know that this is necessarily linked to anything, but as we get further, the testimony and then the crafted declaration, we find that not only did she see who did the shooting, she saw them doing the shooting, ING, and they were either shooting at her house or in the air. The inconsistency, when a claim gets embellished over time, it tends to negate the credibility of the witness. So with respect to the second inconsistency about whether she was warned ahead of time and then there was a shooting or there was a shooting and then there came some warning, you know, Mr. Hahn says that it's a trivial inconsistency that she, that she, a simple confusion about the chronology. It's not a simple confusion about the chronology. It's either a case of, again, referring to her own declaration, living in a violent area where gunfire often happens and then a 17-year-old kid coming along sometime later and saying, hey, you know, the word on the street is that you turned in William. And she said, no, I didn't turn in William. Well, what is the linkage between the two? Of course, she would like there to be a direct linkage or the emissary from the gang comes and says, word on the street is you turned in William and shortly thereafter, gunfire erupts at one's a cause and effect and another is maybe nothing. So it's not a trivial inconsistency there. So what do we make of the fact that she, when she's testifying in her own voice, she's entirely consistent that Bacho comes before and the boy comes after the shooting, but the inconsistency comes with the written statement. Does it make a difference that when she's speaking in her own voice, she's entirely consistent? Well, if we're, you know, if we are told to accept the evidence that she presents in support of her case, we have to do something with the declaration. No, I understand that. But does it make a difference the manner in which the narratives are presented? Because when she's talking in her own voice, she's very consistent. When she's talking in her own voice before the immigration judge, but when she was talking in her own voice in a non-adversarial setting with the asylum officer, she says clearly that there was a shooting. This is a record at 557. She says that there was a shooting and then four or five days later, the shooting was on May 1st, and then four or five days later, the emissary came. So that's also her own voice. No, no, that's right. She's very consistent in saying Bacho comes before, there's then the shooting, and then the 17-year-old boy comes. So, I read the record quite different, that the testimony she says there's a warning, then there's a shooting. Her own voice before the asylum officer is there's a shooting, and then there's a warning. Those two can't be reconciled. Both in her own voice. No, she says both happened. Bacho came first, then there was the shooting, and then there was the boy afterwards. Well, it's the same Bacho, so he came before and after? No, Bacho is the friend, 17-year-old boy, she doesn't know. That's her testimony. Okay. Bacho and the 17-year-old boy are different people. That's her testimony. I believe that Elias Bacho is the same person. No. So, well, nonetheless, we stand on our contention that in her own voice before the asylum officer, she said there was a shooting, and then days later there came a warning. Well, she did say that. She did say that. And she also said that Bacho came before. Before the asylum officer, Your Honor? Before the shooting. But, I mean, at the asylum officer interview? Then it was after the shooting. There's two different versions, is my understanding, about Bacho. My understanding is that Elias Bacho was the emissary who either came before or after, that there were not two emissaries. Before the IJ, I thought she was sure it was after. Before the IJ at 145, 146, and on cross-examination at 193, she said she received the warning before the shooting. In her asylum interview at 557, she says that there was a shooting on May 1st, and then she said the next Wednesday, four or five days later, the emissary came with the warning. And the asylum officer said, well, he looked on the calendar. May 1st was a Wednesday, so four or five days later would be Saturday or Sunday. And she's like, no, it was a Wednesday, so it was a week later. So she fixed in time before the asylum officer that there was a shooting, and then there was a warning, which is exactly opposite of the testimony. I take Your Honor's point. I believe that as we dissected the record, that Elias Bacho was the same person, that he came with one warning, and it was either before or after. She says Elias Bacho is a friend of Williams. And then there's a 17-year-old boy who's a different person. I believe, well, I take your point, Your Honor. And so with regard to the soccer game, again, our contention is that as time goes on, she enters the United States for the second time unlawfully in July of 2013. The interview with the asylum officer is in August. Her testimony is six years later, and the declaration is also six years later. And in the asylum officer, with what happened at the soccer game, there's no mention that the husband was at the soccer game when she was allegedly chased. Her testimony, she says that she was at the soccer game in part because her husband was playing soccer. And she says at 148, he never realized or saw the people who were chasing her. Now, in the declaration, she says Cruz, her ex-husband, kept playing soccer and acted as if nothing was happening. So again, Your Honors, as she gets further away, the claim gets enhanced and it gets embellished. And so if you take her declaration as true, she's saying that he didn't care if the he didn't care. And in the brief, there's an allegation that Cruz would report her, turn her into the gang if she were returned to El Salvador. But nothing like that Again, this is her case. This is her evidence. And so if it doesn't square, it doesn't square. Can I interrupt for just a minute? You said she was there to watch her husband. As I read her testimony, she was there to watch her son. And her husband was also playing. But she was there to watch her son. Well, I mean, her son at the time would have been a toddler or three or four years old. The son was not playing in the soccer game. And, you know, for the context of the other evidence of record here, this is not this is a village. This is a small place. This is not a soccer I don't have it right here in front of me. My recollection of the testimony is that she said, I came there to watch my son play soccer. Am I mistaken on that? I believe she came there to watch her son in the sense of, you know, a day out. But she also was there because her husband was playing soccer. I don't remember the testimony that way. I don't I don't remember that her son, who would have been a toddler or two or three years old, was playing in a soccer game that day. He might have been kicking the soccer ball around in the periphery. But based on her cousin's testimony, I do not remember her saying I came to watch my my my husband play soccer. Do you I believe the I believe the the record certainly says that she came to the soccer Oh, I agree with that. OK, so. But that does not say she came to watch him. OK, fair point. She came to the soccer match where her husband was playing soccer. And her testimony is that when these guys came across the field with their guns, her ex-husband never realized or saw these people. So that that's why he didn't intervene at 148 or her declaration at 277. As I said before, he kept playing soccer and act as as if nothing was happening. So one is either I agree with you. One is either, you know, an innocent he was engaged in the soccer game. And the other one is he doesn't care about me. He's beaten me. He would he would he would turn me into the gangs if I was sent back. And again, these aren't these are inconsistencies and they are not immaterial. And under the totality of the circumstances, her claim simply doesn't doesn't pass substantial evidence review. Well, even if this it's a little hard to parse this. This is, of course, an English translation of the Spanish. She says Cruz just kept playing soccer at the field and act as if nothing was happening. Now, to an English speaker, you might say, well, he knew something was happening, but he acted as if nothing was happening. But it's possible the literal meaning of that is. He acted as if nothing was happening because he didn't realize anything was happening. Well, another view of that is that where reasonable minds can differ about the meaning of this at this stage, we should defer to the fact finder in the first instance who was able to assess all of the evidence and on substantial evidence review should support that finding. But that's just the meaning of this sentence. Does it mean that he saw any pretended or he acted as if nothing was happening because, well, he acted as if nothing was happening because he didn't realize anything was happening? Well, Your Honor, the fact that you you're positing that it could be one or two two interpretations. Well, one of them is consistent, makes your testimony entirely consistent and one doesn't. Yes. And so there's a meaning of this sentence that makes everything of her testimony consistent. And there's a meaning that makes it inconsistent. And well, I think we something that's in Spanish. I'm not sure I'm not sure how to answer that. I mean, I'm not either. But but but we're always just a little bit worried when something was said in one language and now we're reading in English and there's a connotation in English that connotation rather than a literal meaning. I understand. I understand your concern. I would say in this case, the petitioner has been represented by very good counsel both before the immigration judge up to today and the I think we have to take it you know. But that translation was done by a court translator. That was not we're talking about testimony. Her lawyers did not do that translation into English. The testimony? Yeah. No, correct. Correct. So yes, she's represented by a good lawyer, but the lawyer didn't didn't give us this language. So you're so well, I know we're over time, but similar along the lines I asked the other side I was trying to recall in this case. Have there been any attempt to mediate this case? So with respect to mediation, Mr. Hahn reached out in the late fall or or early winter and said that and he can explain, you know, he's I'll ask him to explain on his rebuttal time and said that there is a there was then there was a pending you visa for the daughter who's not a party to this this action for the daughter you visa and would would my office entertain, you know, some kind of abeyance or judicial administrative closure but we get requests for a pending visa all the time and it may or may not mean anything. And so we declined at that at that point and then in the late winter early spring, Mr. Hahn said the actual that pending you visa is now has now been approved for the daughter and my understanding is that the petitioner here the mother can be or is a derivative of that you visa. So I'm not certain that I'm not certain I'm not certain what exactly that does for her. I'll let Mr. Hahn explain that but here's why and he reached out again in the late winter early spring. Could we do mediation? Could we park this? And it was discussed in my office and I'll tell the panel that after a different panel of this court in SARCAR issued a decision in which it really took great issue with the government and private bar trying to enter into judicial administrative closure after the after briefing had been completed and the course I'm sorry the case had been scheduled for argument and so after that my office has taken a slightly different view and so uncertain how a panel would view putting this in administrative closure or some other kind of advance. I can understand that because some people take that view but I don't think that's a uniform view of the court. If it caused some ripples in my office. I can understand that. We can understand why. And it's a big office and people are still interpreting you know how and when judicial administrative closure can be used. Is it going to get rejected? The attorney who did oral argument she was taken to task for having asked for judicial administrative closure some six weeks before oral argument. No we're aware of those circumstances but if and the timing of here we are at this argument and the possibility that the government could reach a negotiated solution given the potential derivative status I assume if the panel were to order mediation the government would willingly attend. Absolutely. And to the point where you guys sandbagged the panel this was me asking the question. So to me you are in the clear and I am in no way upset the fact that you have suggested this. So just we're on video looking at the camera. No issues here. Thank you. Thank you counsel. I appreciate it. And if you could talk about mediation that's why I asked the questions before. I'll begin with that. Just to be clear it's correct that Ms. Barasa's daughter has filed a U visa application. It was filed in 2019. Ms. Barasa is included as a derivative of an application she qualifies because her daughter was under 21 when it was filed. It has not been approved. They don't have U visas yet and that's because there's a as the court probably knows there's significant backlog in processing these cases. But the USCIS has been reviewing these applications and if it appears that the person is prima facie eligible for a U visa they grant what's called deferred action. And deferred action means that they will not take any steps to remove the person from the United States. And that would be the daughter under the U visa. Right. Correct. And so we've gotten the notice that the daughter's petition is technically because she still needs to file a work permit in order to technically be granted deferred action. We filed work permits for her and for Ms. Barasa. We anticipate that once those are approved they will you know the family will be in deferred action which doesn't mean they have permanent status but does mean that they can't be removed. And so that was the reason we went back to the government to ask for judicial closure the second time. So just kind of running things out. If the court here were to deny the petition but as we know it's rare that any immediate action is taken and then in the interim Ms. Barasa's mother were to be part of the deferred action then she would not be eligible for removal. Correct. That's correct. And I think even I don't want to speak for the government but I think even under these circumstances where technically she's not in deferred action it's hard for me to imagine that I should take any removal action. So one thing I have seen done in other cases is we actually would defer send you guys to mediation and then you would effectively give us status reports every three to six months and sometimes it works out and sometimes it doesn't. Is that, again I'll let the mediator go that route, the mediator can figure this out, but is that something that you would be comfortable with if we simply put a hold on this case to see if something can be worked out with the parties providing us with status reports? Yeah, we'd definitely be amenable to that. And do you have any estimate of how long it's taking to move from this kind of preliminary deferred status to actually being granted the U-Visa? Right now they're approving U-Visa applications that were filed in 2016. This was filed in 2019. That sounds good on its face but there are far more people who have applied each year so it's not even a one-to-one thing. It's going to be a lot more than three years until they're granted U-Visas. I guess I'm over time. Thank you very much, counsel. Thank you both for your outstanding briefing and argument. We really appreciate it. This matter is submitted.
judges: McKEOWN, FLETCHER, OWENS